# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SUNOCO, INC. (R&M)** )<br>    Plaintiff,    )<br>                  )<br>v.                )<br>                  )<br>**GREAT ROAD AUTO, INC.,**    )<br>**FRANCIS KARAM, Alias,**     )<br>**NADIA KARAM, Alias**        )<br>**JW SERVICE CENTER, INC.**   )<br>**JAMES J. WALTON, Alias**    )<br>**NANCY WALTON, Alias**       )<br>**JOHN DOE, Alias**           )<br>**J&J REALTY TRUST, by and through** )<br>**Yacoub and Asize Fadel,**   )<br>**YACOUB FADEL, Alias,**      )<br>**individually and as Trustee of the J&J** )<br>**Realty Trust, and**         )<br>**ASIZE FADEL, Alias, individually and** )<br>**as Trustee of the J&J Realty Trust.** )<br>    Defendants.    ) | Civ. Action No. 06cv12302-NG |

**GERTNER, D.J.**

## MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT
September 28, 2010

In 2002, Sunoco, Inc. (R&M) ("Sunoco") sold a gas station and entered into a franchise agreement that required the station to operate as a Sunoco franchise and purchase Sunoco-branded petrol for a minimum of ten years or until it had reached a total sale of 8.4 million gallons. The gas station was subsequently sold and eventually ceased operations before meeting the volume requirements of the franchise. Sunoco brought suit against the succeeding owners and operators of the station.

Sunoco has filed a Motion for Summary Judgment against all defendants. Defendants J&J Realty Trust and the Fadels; JW Service and the Waltons; and Great Auto have filed their own Motions for Summary Judgment.

## I. BACKGROUND

### A. Overview

This case is about a franchise Sunoco gas station at 332 /336 Great Road in Acton, Massachusetts. Sunoco alleges that defendants, as subsequent owners and operators of the station, are jointly and severally liable for failing to fulfil a contractual obligation to purchase a total of 8.4 million gallons of fuel from Sunoco. Compl. (document #1). Defendants' alleged obligations to Sunoco arise from two transactions: First, in spring of 2002, Sunoco sold the property on which the gas station is located to Weeton Holdings and entered into a Dealer Supply Franchise Agreement with Weeton's counterpart, JW Service. See J. Statement of Facts ¶¶1-12, (document #77). Under the franchise agreement, JW Service agreed to purchase Sunoco-branded fuel for a period of ten years or until its purchases from Sunoco totaled 8.4 million gallons, with a minimum of 70,000 gallons monthly. Dealer Supply Franchise Agreement §1.02 Ex. 2, (document #76-3). Second, in spring of 2004, Weeton and JW Service sold the station and transferred the franchise obligations to J&J Realty Trust and Great Road Auto. Under the arrangement, Great Road leased the premises from J&J Realty Trust. J. Statement of Facts, ¶¶14-22 (document #77).

In September 2005, Great Road and J&J Realty mutually agreed to terminate the lease and cease operation of the Sunoco franchise without notifying Sunoco. The station had failed to fulfil the minimum volume requirement of 8.4 million gallons and had operated as a Sunoco station for less than ten years. Sunoco now claims that each of the defendants are liable for the resulting breach of the Dealer Supply Franchise Agreement. Compl. (document #1).

**B.     Agreements**

Both sales of the gas station involved agreements relating to: I) the sale or lease of the land and assets; ii) the operation of the station and franchise obligations; and iii) personal guarantees to Sunoco. Every one of these agreements referenced the original Dealer Supply Franchise Agreement or its obligations.

**1.     First Sale**

Sunoco envisioned selling the petrol station to Nancy and James Walton. See Sunoco's LR 56.1 Stmt. ¶¶ 1-2 (document #83). For this purpose, the Waltons created Weeton Holdings, LLC to purchase the real estate underlying the premises. JW Mem. Summ. J. 1 (document #76). They created JW Service Center, Inc. to operate the gas station. Id. at 1-2.

**a.     Property -- Agreement of Sale**

On February 20, 2002, Sunoco entered into an Agreement of Sale to sell the property located at 332/336 Great Road in Acton, Massachusetts, to Weeton Holdings, LLC for $600,000. J. Statement of Facts ¶ 1 (document #77); Agreement of Sale Ex. 1 (document #76-1). The Agreement of Sale required that the parties enter into a Dealer Supply Franchise Agreement for a term of at least ten years. Id. § 14(a).

**b.     Operations -- Dealer Supply Franchise Agreement**

Accordingly, Sunoco and JW Service entered into the Dealer Supply Franchise Agreement on March 11, 2002. J. Statement of Facts ¶ 6 (document #77); Dealer Supply Franchise Agreement Ex. 2 (document #76-3). The franchise agreement required, *inter alia*, that JW Service purchase Sunoco-branded fuel for a period of ten years or until its purchases from Sunoco totaled 8,400,000 gallons, with a monthly minimum of 70,000 gallons. Id. § 1.01. Sunoco also

agreed to pay $140,000 cash consideration to cover site improvements, renovations, and equipment purchases. Id. § 2.02. This up-front payment was to be offset by a per-gallon charge on gasoline sold to JW Service. Id. § 2.03. The franchise agreement provided for liquidated damages if JW Service failed to meet contractual volume requirements. Id. § 3.07(d). It also required JW Service to show proof of its control over the premises by either title or lease coterminous with the franchise agreement. Id. § 1.08 (document #76-3). JW Service leased the premises from Weeton Holdings.

### c. Personal Guarantee -- Guarantee Agreement

On March 15, James and Nancy Walton entered into a Guarantee Agreement with Sunoco. Guarantee Agreement Ex. 3 (document #76-4). The guarantee reads in part:

> In order to induce [Sunoco] to extend additional credit to JW Service Center, Inc. (herein "Debtor"), concerning the purchase of products and services from [Sunoco], the undersigned hereby guarantee, jointly and severally, the full and prompt payment to [Sunoco] of any indebtedness and any other monetary liabilities and obligations of Debtor to [Sunoco] in connection therewith . . . . Although referred to as a Guarantee, this instrument is intended to be a contract of suretyship upon which the undersigned intends to be legally bound.

Id.

### 2. Second Sale

Two years later in spring of 2004, the Waltons, through Weeton Holdings and JW Service, agreed to sell the gas station and transfer their obligations under the franchise agreement to Francis Karam. Francis was acting on behalf of his brother-in-law, Yacoub Fadel, who wanted to buy the station but believed that Sunoco would not consent to his involvement. See Yacoub Dep. 89: 10-14. Oct. 5, 2009 (document #76-20). On March 30, 2004, Francis, Nadia and Rami

Karam, Asize's nephew, formed Great Road Auto for the purpose of operating the station. Id. ¶ 16. On April 30, Francis Karam and Yacoub Fadel created J&J Realty Trust, naming themselves as trustees, to hold the land. See J. Statement of Facts ¶ 15 (document #77). Again, the parties entered into three sets of agreements to execute the transfer of the property and operations.

> **a.  Property and Assets -- Purchase and Sales Agreement; Asset Purchase Agreement; and Assignment and Assumption of Agreement of Sale and Rights of Access and Indemnity Agreement**

On March 11, 2004, Francis Karam entered into a Purchase and Sales Agreement with Weeton Holdings to buy the land. See Ex. 5 (document #76-6). Francis Karam signed the agreement as a trustee of J&J Realty Trust, an entity that did not yet exist. On the same date, he entered into an Asset Purchase Agreement to purchase the assets of the business from JW Service. Again, he signed as a trustee of J&J Realty. See Ex. 7 (document #76-8).

Both of the agreements required J&J Realty, as owner of the premises and the station, to honor and abide by the franchise agreement. The Purchase and Sale Agreement provided: "The Buyer agrees to honor the existing distribution contract with Sun Oil or in the alternative to buy out the existing agreement upon terms that are mutually satisfactory to Sun Oil and the Buyer." Ex. 5 § 26(a) (document #76-6). The Asset Purchase Agreement used almost identical language: "The Buyer agrees to honor the present Sun Oil Franchise and distribution contract, but retains the right, at his sole and exclusive discretion, to buy out the remaining term of the distribution contract upon terms mutually acceptable to both the supplier and the Buyer." Ex. 7 ¶ 15 (document #76-8).

As it undertook the obligations under the original franchise agreement, J&J Realty also agreed to "indemnify, reimburse, hold harmless and defend [JW Service] of and from any and all debts, claims, taxes, costs and expenses . . . resulting from the operation and conduct" of the business.  See Asset and Purchase Agreement Ex. 7 ¶ 9 (document #76-8).

On June 11, 2004, J&J Realty Trust and Weeton Holdings executed an Assignment and Assumption of Agreement of Sale and Rights of Access and Indemnity Agreement, in which J&J Realty received "all of [Weeton's] obligations and responsibilities under the . . . [Agreement of Sale]" Ex. 14 § 1 (document #76-15).  The agreement provided that its terms "shall be binding upon the parties and shall inure to the benefit of Sunoco and Buyer/Assignee and their respective heirs, executors, administrators, successors and assigns." Id. § 3.

### b. Operations -- Assignment and Assumption Agreement of Dealer Supply Franchise

On June 11, 2004, JW Service and Great Road executed an Assignment and Assumption Agreement of Dealer Supply Franchise, in which Great Road was assigned "all of [JW Service's] rights, title and interest in and to the Agreement," and "assume[d] and covenant[ed] to perform all terms, covenants and obligations of [JW Service] under the Agreements." Ex. 13 § 1-2 (document #76-14).  Great Road acknowledged that under the assignment it was obligated to purchase an additional 6,733,644 gallons over the remaining term. Id. § 8.  Sunoco signed the agreement and explicitly consented to the assignment from JW Service to Great Road without releasing JW Service from the franchise assignment. Id. § 9.

### c. Guarantee -- Guarantee Agreement

Francis and Nadia Karam executed a Guarantee Agreement, dated June 18, 2004. Ex. 16 (document #76-17). Rami Karam executed an identical Guarantee Agreement the same day. Ex. 17 (document #76-18). The Karams' Guarantee Agreements were identical to those executed by the Waltons in 2002 and guaranteed the full payment of any "indebtedness and any other monetary liabilities and obligations" of Great Road Auto to Sunoco, again in exchange for additional credit to Great Road. Id.

**C. Termination**

In September 2005, Yacoub and Azize Fadel, Trustees of the J&J Realty Trust, and the Karams and Great Road, mutually agreed to terminate the Commercial Lease covering the Fadels' use of the Premises. J. Statement of Facts ¶ 23 (document #77); Ex. 18 (document #76-19). The parties' stated goal of the release was to terminate "all liabilities, obligations, remedies and entitlements" created by the lease. Ex. 18 (document #76-19). Sometime in late October or early November 2005 -- without prior notice or approval from Sunoco -- Great Road stopped operating the Sunoco station on the Premises. J. Statement of Facts ¶ 24 (document #77).

**II. STANDARD OF REVIEW**

A grant of summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Continental Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991) (quoting Fed.R.Civ.P. 56(c)). The court does not weigh the evidence, but instead determines whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The court must view the record in the light most favorable to the non-moving party, accepting all reasonable inferences

favoring that party. Continental Cas. Co., 924 F.2d at 373. The fact that all parties are moving for summary judgment does not affect the standard of review. Id. (citing Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

## III. DISCUSSION

The question here is which defendants are liable to Sunoco under the original franchise agreement and subsequent agreements and guarantees. According to Massachusetts law, an unambiguous contract is interpreted according to its terms. In re Blinds to go Share Purchase Litigation, 443 F.3d 1, 5 (1st Cir. 2006). When the contract is unambiguous, its words must be construed in their usual and ordinary sense. Ober v. Nat'l Cas. Co., 318 Mass. 27, 30 (1945). A dispute between parties does not alone render a contract ambiguous. In re Blinds, 443 F.3d at 6 ("There is no ambiguity simply because a dispute exists between the contracting parties, each lobbying for its own preferred interpretation."). In support of their cross-motions for summary judgment, the parties have submitted a Joint Statement of Undisputed Facts and a list of Stipulated Exhibits which refer to the numerous contracts and agreements between and among themselves. No party disputes the existence and content of the agreements. To the extent the court finds the agreements to be unambiguous, then, the court must resolve the dispute by interpreting the usual and ordinary meanings of the contracts' terms.

In this case, the parties to the original contracts with Sunoco attempted to transfer all of their obligations to the new owner and operator. A party to a contract can assign their obligation to another unless that assignment is contrary to public policy or the terms of his promise. An obligor's assignment of the duty, however, does not discharge his obligation under the contract unless the obligee agrees otherwise. See; Guiliani v. Penny, 1998 WL 1198695,*2 (Mass.Super.

1998) ("[T]he party contracting remains liable regardless of who actually performs the contract obligation.") (citing REST 2d CONTR § 318).  To the extent that the parties owed a duty to Sunoco, then they could assign that duty but would remain liable in the event of a breach.  Only the original contracting party and obligee, Sunoco, could agree to discharge them of their obligation.

The attention then shifts to the liability of the party to whom the obligation was transferred.  To the extent that this second party assumes the obligation of the original contract, they now owe a duty to perform both to the original obligee (Sunoco) and to the assignor.  The original obligee becomes a third party beneficiary of the contract between the assignor and the assignee and can enforce the duty of both.  Choate, Hall & Stewart v. SCA Services, Inc., 378 Mass. 535, 392 N.E.2d 1045, 1050 (Mass. 1979) (adopting the rule as explained by Professor Corbin: "If the promisee in a contract contemplates the present or future existence of a duty or liability to a third party and enters into the contract with the expressed intent that the performance contracted for is to satisfy and discharge that duty or liability, the third party is a creditor beneficiary" entitled to enforce the contract.  4 Corbin, Contracts s 787 at 95 (1951)); See also Quigley v. Bay State Graphics, Inc., 427 Mass. 455, 693 N.E.2d 1368 (1998) (a "promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty") (quoting REST 2d CONTR § 304).  Sunoco, then, can enforce the duty to perform under the original agreements against both the original contracting party and the assignees who assumed their obligations in a subsequent contract.

With these contract principles in mind, we will consider each parties' liability in turn.

### A.     JW Service

At the time of the first sale, JW Service entered into a Dealer Supply Franchise Agreement with Sunoco that required JW Service to purchase Sunoco-branded fuel for a period of ten years or until its purchases from Sunoco totaled 8,400,000 gallons, with a monthly minimum of 70,000 gallons. Ex. 2 § 1.01 (document #76-3). The franchise agreement provided for liquidated damages if JW Service failed to meet contractual volume requirements. Ex. 2 § 3.07(d) (document #76-3). No party disputes the clear terms of this contract: JW Service assured the purchase of Sunoco fuel for ten years or until it met the volume requirement.

JW Service argues that its obligation terminated when it assigned the franchise agreement to Great Road Auto and sold its assets to J&J Realty. See Assignment and Assumption Agreement of Dealer Supply Franchise Ex. 13. According to basic contract principles, however, the assignment would not terminate the original obligation to Sunoco unless Sunoco agreed. See Thermo Electron Corp. v. Waste Management Holdings, Inc., 2003 WL 354864, *5 (Mass.Super. 2003) ("It is a well settled principle of contract law that a party may not unilaterally assign away its obligations under a contract."). Here, not only did Sunoco not agree to the termination of JW Service's original obligation, but Sunoco actually *preserved* their rights against JW Service in the Assignment and Assumption Agreement of Dealer Supply Franchise. Ex. 13 § 9 ("Upon execution (below) by Sunoco, Sunoco consents to the assignment *without releasing Assignor from the Agreements referenced above*.") (emphasis added). The usual and ordinary meaning of this clause is clear: The Assignor, JW Service, was never released from liability and therefore remains liable to Sunoco. The parties have stipulated that the station ceased operations prematurely in violation

of the Dealer Supply Franchise Agreement.  JW Service is liable to Sunoco for this breach, and Sunoco's Motion for Summary Judgment is therefore GRANTED as to JW Service.

JW Service's cross-claim against J&J Realty for indemnity will be considered below.  It is worth noting here, however, that the indemnity agreement between J&J and JW Service does not affect Sunoco's ability to recover from JW Service.

**B.   Waltons**

Mr. and Ms. Walton signed a Guarantee Agreement, personally guaranteeing the obligations of JW Service to Sunoco in exchange for Sunoco's extension of additional credit.  Ex. 3 (document #76-4).  A guarantee is considered a contract like any other and must be interpreted accordingly.  Federal Financial Co. v. Savage, 431 Mass. 814, 817 (2000).  When the wording is clear, the words alone determine the meaning of the guarantee.  Id.  Here, the language of the guarantee is broad and unequivocal:  The Waltons guaranteed the " prompt payment to [Sunoco] of *any indebtedness* and *any other monetary liabilities and obligations* of Debtor to [Sunoco] in connection therewith."  Ex. 3 (document #76-4) (emphasis added).  A plain reading suggests that the term "any other . . . . obligations" of JW Service to Sunoco encompasses their obligations under the Dealer Supply Franchise Agreement.  The Court finds therefore that the Waltons' liability to Sunoco mirrors that of JW Service and GRANTS Sunoco's Motion for Summary Judgment as to the Waltons.

**C.   J&J Realty Trust**

JW Service and Weeton Holdings assigned to J&J Realty all of their respective assets and obligations as to the gas station, including their obligations to Sunoco under the franchise

agreement. As assignees of these obligations, J&J Realty owed a duty to both the assignors and to Sunoco as a third party creditor beneficiary. See Choate, Hall & Stewart, 392 N.E.2d at 1050.

The Purchase and Sales Agreement, in which Weeton transferred title of the Premises to J&J Realty, and the Assets Purchase Agreement, in which J&J Realty acquired the assets and franchise rights to operate the station, both required J&J Realty to "honor the present Sun Oil Franchise and distribution contract" unless J&J Realty were to buy out the remaining term of the Agreements. Ex. 6 § 26a (document #76-7); Ex. 7 § 15 (document #76-8). Three months later, Weeton formally assigned to J&J Realty its purchase agreement with Sunoco. See Assignment and Assumption of Agreement of Sale and Rights of Access and Indemnity Agreement Ex. 14 (document #76-15).

A plain reading of the sales agreements and assignment makes clear that J&J Realty agreed to honor the existing Sunoco contract which required, *inter alia*, continuing to operate a Sunoco-branded gas station on the premises. J&J Realty assumed all obligations stemming from ownership of the real property and assets. Sunoco was a clear third party beneficiary of these subsequent contracts and entitled to enforce J&J Realty's duty to uphold the original franchise agreement. Quigley, 427 Mass. at 463 (citing REST 2d CONTR § 304).

Sometime in 2005, J&J Realty agreed to terminate Great Road's lease to operate on the Premises (making Great Road's obligation to honor the Dealer Supply Franchise Agreement impossible) and, subsequently, operated a non-Sunoco branded gas station on the Premises, in clear violation of their obligations to Sunoco. J&J Realty is liable to Sunoco for this breach and Sunoco's Motion for Summary Judgment is therefore GRANTED as to J&J Realty Trust.

JW Service has brought a cross-claim against J&J Realty for indemnity. J&J Realty, in the Asset Purchase Agreement, specifically agreed to

> indemnify, reimburse, hold harmless and defend [JW Service] of and from any and all debts, claims, taxes, costs and expenses of any and every nature whatsoever resulting from the operation and conduct of the business acquired by [J&J Realty] hereunder and the use, if any, of [JW Service's] name by [J&J Realty] after the transfer date.

Ex. 7 § 9 (document #76-8). A plain reading of this clause is clear. To the extent that JW Service is held liable to Sunoco -- and this Court has held that JW Service is indeed liable to Sunoco under the Dealer Franchise Supply Agreement -- J&J Realty must reimburse JW Service, including the cost of defense. Again, this clause does not affect Sunoco's ability to recover from JW Service. It means only that J&J Realty must reimburse JW Service for any payments made to Sunoco in connection with this suit. JW Service's Motion for Summary Judgment is hereby GRANTED as to its cross-claim against J&J Realty Trust.

### D.     Fadels

Sunoco alleges that the Fadels, as trustees of J&J Realty Trust, are personally liable for J&J's breach of contract. In Massachusetts, trustees are not personally liable on contracts that they sign in their fiduciary capacity in the course of their administration. M.G.L.A. 203 §14A. Trustees *are* personally liable, however, for obligations that arise out of their ownership or control of the property. Id. ("A trustee shall be personally liable for obligations arising from ownership or control of property of the trust estate."). In other words, their liability depends on whether they are fiduciary trustees or "trustees for themselves in conduct of business affairs." See Apahouser Lock and Sec. Corp. v. Carvelli, 26 Mass.App.Ct. 385, 528 N.E.2d 133, 135 (1988)

(affirming finding that trustees of realty trust could be held personally liable under contract because they were acting as trustees for themselves as owners). Here, the Fadels are in this latter category. Yacoub Fadel signed the Purchase and Sales Agreement and the Asset Purchase Agreement as a "trustee" for J&J Realty Trust before he even created the trust. At all times, the Fadels exercised ownership and control over the station. When they entered into contracts and agreements, they were acting in the conduct of their own business. They are thus personally liable for the contract obligations of their trust, and their liability mirrors that of J&J Realty. This Court therefore GRANTS Sunoco's Motion for Summary Judgment as to the Fadels. Accordingly, the Fadels Motion for Summary Judgment (document #78) is DENIED.

### E.   Great Road Auto

The liability of Great Road is less clear based on the facts before the Court at this time. About three months after JW Service/Weeton sold the gas station property and assets to J&J Realty, JW Service assigned the Dealer Supply Franchise Agreement to Great Road. See Assignment and Assumption Agreement of Dealer Supply Franchise Ex. 13 (document #76-14). Great Road assumed the obligations and acknowledged that it was required to purchase an additional 6,733,644 gallons over the remaining term. Id. § 8. The assignment agreement included a condition that Great Road have a lease on the Premises sufficient to allow it to satisfy the terms of the franchise agreement. Id. In September 2005, Great Road and J&J Realty agreed to terminate Great Road's lease on the Premises, causing a violation of the obligations owed to Sunoco. Agreement to Terminate Commercial Lease & Mutual Release of Liabilities Ex. 18 (document #76-19).

Great Road argues that the existence of the lease was a condition precedent to the assignment. It could not uphold the franchise agreement without access to the property. While it is true that the lease was a condition of the assignment, questions of fact remain as to the complicity of Great Road in the termination of the lease. See, e.g., Information Mapping, Inc. v. Duffy Properties, LLC, 17 Mass.L.Rptr. 544 (Mass. Super. 2004) at *6 n.4 (noting that lessor and lessee cannot "voluntarily get together" and terminate a lease to the detriment of a third party's legitimate and existing interest). In this case, Great Road could not simply decide with J&J Realty to terminate the lease and operations to the clear detriment of Sunoco. Moreover, they could not release one another of an obligation to a third party as they attempted. Their mutual release of "all liabilities, obligations, remedies and entitlements" did not constitute a release of their obligations to Sunoco as Sunoco was not privy to that agreement. Agreement to Terminate Commercial Lease & Mutual Release of Liabilities Ex. 18 (document #76-19). Great Road's liability to Sunoco, then, will depend on its participation in the decision to terminate the lease and operations. Sunoco's Motion for Summary Judgment as to Great Road is DENIED. Great Road's Motion for Summary Judgment is also DENIED.

**F.    Karams**

Francis and Nadia Karam executed a Guarantee Agreement on June 18, 2004, and Rami Karam executed an identical agreement the same day. See Ex. 16 and 17 (documents #76-17, 18). The agreements were the same as those executed by the Waltons and guaranteed the full payment of any "indebtedness and any other monetary liabilities and obligations" of Great Road Auto to Sunoco, again in exchange for additional credit to Great Road. As in the case of the Waltons, the Court finds that the Karams assumed all the obligations of Great Road to Sunoco,

including its obligations under the Assignment and Assumption Agreement of the Dealer Supply Franchise Agreement. Ex. 13 (document #76-14); see discussion supra § B. The liability of the Karams will therefore mirror the liability of Great Road Auto. Because questions of fact remain as to the liability of Great Road Auto to Sunoco, the Karams liability is similarly unknown at this time. The Court accordingly DENIES Sunoco's Motion for Summary Judgment as to the Karams. And the Court DENIES the Karams' Motion for Summary Judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that JW Service Center, Inc., Nancy and James J. Walton, J&J Realty Trust, and Asize and Yacoub Fadel are jointly and severally liable to Sunoco for breach of the franchise obligations. Motion of Plaintiff Sunoco, Inc., (R&M) for Summary Judgment as to All Named Defendants (**document #82**) is **GRANTED IN PART AND DENIED IN PART.** The Court **GRANTS** Sunoco's Motion for Summary Judgment as to JW Service Center, Inc., Nancy and James J. Walton, J&J Realty Trust, and Asize and Yacoub Fadel. A triable issue of fact remains as to the liability of Great Road Auto, and thereby Francis and Nadia Karam, and Sunoco's Motion for Summary Judgment is **DENIED** as to these defendants.

**The Motion for Summary Judgment filed by Great Road Auto (document** #80) and the Motion for Summary Judgment filed by the Fadels and J&J Realty Trust (**document #78**) are **DENIED.** The Motion for Summary Judgment filed by JW Service Center (**document #81**) is **GRANTED IN PART** only as to the cross-claim against J&J Realty and otherwise **DENIED**.

**SO ORDERED.**
Date: **September 28, 2010**            */s/ Nancy Gertner*
                                        **NANCY GERTNER, U.S.D.C.**